**UNITED STATES DISTRCIT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| CHIRAG MODY, Derivatively on Behalf of VITAL FARMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>RUSSELL DIEZ-CANSECO, GLENDA FLANAGAN, KOFI AMOO-GOTTFRIED, BILLY CYR, KELLY KENNEDY, KARL KHOURY, DENNY MARIE POST, GISEL RUIZ, THILO WREDE, and MATTHEW O'HAYER,<br><br>Defendants,<br><br>and,<br><br>VITAL FARMS, INC.<br><br>Nominal Defendant. | Case No: 1:26-cv-01860<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Chirag Mody ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Vital Farms, Inc. ("Vital Farms" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through issuing false statements in this District.

5. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6. Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7. ***Nominal Defendant Vital Farms*** is incorporated under the laws of Delaware, with its principal executive office located at 3601 South Congress Avenue, Suite C100, Austin, TX 78704. Vital Farms common stock trades on The Nasdaq Stock Market LLC (the "NASDAQ") under the ticker symbol "VITL."

### Director Defendants

8. ***Defendant Russell Diez-Canseco*** ("Diez-Canseco") served as the Company's Chief Executive Officer ("CEO") and President at all relevant times. According to the Company's 2025 Proxy Statement, Defendant Diez-Canseco received $3,616,512 in total compensation in 2025.

9. ***Defendant Glenda Flanagan*** ("Flanagan") served as a director of the Company at all relevant times hereto. According to the Company's 2025 Proxy Statement, Defendant Flanagan received $179,981 total compensation in 2025.

10. ***Defendant Kofi Amoo-Gottfried*** ("Amoo-Gottfried") served as a director of the Company at all relevant times hereto. According to the Company's 2025 Proxy Statement, Defendant Amoo-Gottfried received $179,981 total compensation in 2025.

11. ***Defendant Billy Cyr*** ("Cyr") served as a director of the Company at all relevant times hereto. According to the Company's 2025 Proxy Statement, Defendant Cyr received $154,994 total compensation in 2025.

12. ***Defendant Kelly Kennedy*** ("Kennedy") served as a director of the Company at all relevant times hereto. According to the Company's 2025 Proxy Statement, Defendant Kennedy received $197,481 total compensation in 2025.

13. ***Defendant Karl Khoury*** ("Khoury") served as a director of the Company at all relevant times hereto. According to the Company's 2025 Proxy Statement, Defendant Khoury received $197,481 total compensation in 2025.

14. ***Defendant Denny Marie Post*** ("Post") served as a director of the Company at all relevant times hereto. According to the Company's 2025 Proxy Statement, Defendant Post received $189,981 total compensation in 2025.

15. ***Defendant Gisel Ruiz*** ("Ruiz") served as a director of the Company at all relevant times hereto. According to the Company's 2025 Proxy Statement, Defendant Ruiz received $189,981 total compensation in 2025.

16. ***Defendant Matthew O'Hayer*** ("O'Hayer") is the founder of the Company and served as Chairman of the Board and director at all relevant times through to his resignation on February 20, 2026.

17. The above-named defendants are collectively referred to herein as the "Director Defendants."

**<u>Officer Defendants</u>**

18. ***Defendant Thilo Wrede*** ("Wrede") served as the Company's Chief Financial Officer ("CFO") at all relevant times. According to the Company's 2025 Proxy Statement, Defendant Wrede received $1,647,391 in total compensation in 2025.

19. Defendant Wrede together with Defendant Diez-Canseco are collectively referred to herein as the "Officer Defendants."

20. The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## <u>SUBSTANTIVE ALLEGATIONS</u>

**<u>Background</u>**

21. Vital Farms is a consumer-packaged goods company focused on producing and distributing ethically sourced food products, including shell eggs, butter, and related offerings. The Company markets itself as a leader in the pasture-raised food category, emphasizing animal welfare, sustainability, and transparency in its sourcing and production practices.

22. Vital Farms operates a distributed supply chain comprised of more than 600 small family farms, which serve as the foundation of its production model. The Company represents that this decentralized sourcing approach enhances supply chain resilience and supports consistent product quality.

23. Since its founding in 2007 in Austin, Texas, Vital Farms has expanded from a local producer selling at farmers markets to a nationally distributed brand. The Company's products are now sold through a multi-channel retail network spanning more than 24,000 stores across the United States, including major national retailers such as Whole Foods, Kroger, Target, Walmart, and Publix.

24. To support its growth, Vital Farms has made substantial investments in its production and supply chain infrastructure. The Company owns and operates "Egg Central Station," a large-scale egg processing facility located in Springfield, Missouri, which is capable of processing millions of eggs per day and serves as a key component of the Company's logistics and fulfillment operations.

25. In addition to its existing facilities, Vital Farms has undertaken further expansion efforts, including the development of a second automated egg processing facility in Seymour, Indiana, intended to increase capacity and support continued growth.

**Vital Farms' Implementation of a Company-Wide**
**Enterprise Resource Planning System**

26. The Company has emphasized investments in operational efficiency and scalability, including the implementation of new technology systems designed to support its expanding business. In particular, Vital Farms undertook a multi-year initiative to implement a new cloud-based Enterprise Resource Planning ("ERP") system, which it described as critical to improving processes, enhancing efficiency, and supporting future growth. The Company described this transition as a key component of its operational infrastructure, intended to "support [its] future growth and more fully optimize [its] existing processes."

27. On March 7, 2024, Vital Farms filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2023 (the "2023 10-K"). In that filing, the Company discussed its ongoing implementation of an ERP system and identified risks associated with that transition, including the following:

> We are in the process of transitioning to a new enterprise resource planning, or ERP, system, in order to support our future growth and more fully optimize our existing processes. The implementation of a new ERP system may prove to be more difficult, costly or time-consuming than expected, and it is possible that the system will not yield the benefits we anticipate. Any disruptions, delays or deficiencies

> related to the new ERP system could materially impact our operations and adversely affect our ability to process orders, manage our inventory, fulfill obligations to customers or otherwise operate our business. In addition, implementation of a new ERP system will require significant resources, including the time and attention of our management and key crew members, in order to fully realize the anticipated benefits.

28. The ERP system was designed to serve as an integrated platform for managing core business functions, including order processing, inventory management, fulfillment operations, and financial processes. The Company acknowledged that these functions were central to its ability to operate effectively, such that deficiencies in the ERP system could impair its ability to process orders, manage inventory, fulfill customer obligations, and otherwise conduct its business.

29. Vital Farms positioned the ERP implementation as part of its effort to build a scalable and efficient operating model capable of supporting its rapid expansion. As the Company grew its distribution footprint and increased production capacity, it emphasized the need for improved systems and processes to maintain operational consistency and efficiency across its business. The ERP system was intended to provide the technological foundation necessary to manage that growth and align internal processes with increasing operational complexity.

30. The implementation of the ERP system was a resource-intensive undertaking, requiring significant financial investment as well as substantial involvement from management and key personnel. The Company disclosed that the transition required, and would continue to require, the "time and attention of [its] management and key crew members," reflecting the importance and complexity of the system within the organization.

31. In addition to its operational role, the ERP system was tied to the Company's efforts to strengthen its internal processes and control environment. The Company indicated that completion of the ERP transition contributed to enhancing its control environment, demonstrating

that the system was not only operationally significant but also relevant to financial reporting and internal controls.

32. In its Annual Report on Form 10-K for the fiscal year ended December 29, 2024, Vital Farms disclosed that its internal control over financial reporting was not effective due to a material weakness in its revenue processes. The Company identified deficiencies in the design and operation of process-level controls related to sales order entry and invoicing, including controls intended to ensure the accuracy of key inputs such as price and quantity.

33. The Company attributed this material weakness, in part, to deficiencies in its internal risk assessment and a lack of sufficient personnel with the requisite expertise to design, implement, and maintain effective control activities. These disclosures indicated that, as the Company continued to scale its operations, it lacked adequate internal infrastructure and trained resources necessary to support reliable financial and operational processes.

34. These control deficiencies were directly relevant to the Company's ongoing system implementation. The system was designed to serve as an integrated platform for managing core business functions, including order processing, invoicing, inventory management, and financial reporting. As such, the existence of a material weakness in these same processes underscores the importance and operational sensitivity of the implementation.

35. The Company further acknowledged that remediation of the identified control deficiencies would require additional time, attention, and resources from management. This disclosure is consistent with its statements that the system implementation was a resource-intensive, multi-year initiative requiring significant involvement from management and key personnel.

36. At the same time, the Company continued to emphasize the system as a critical component of its efforts to improve processes and support future growth, while also cautioning that the implementation carried risks, including the potential for operational disruptions affecting order processing, inventory management, and fulfillment. These parallel disclosures reflect that the system was not only central to the Company's operations, but also closely intertwined with its ability to address existing control deficiencies and maintain effective execution across its core business functions.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

37. On April 28, 2025, the Director Defendants caused the Company to issue the 2025 Proxy Statement on Schedule 14A with the SEC. In the 2025 Proxy Statement, the Director Defendants solicited shareholder approval for, *inter alia*: (i) the re-election of Defendants Flanagan, Post, and Ruiz to the Board; (ii) executive compensation; and (iii) an amendment to the Company's certificate of incorporation to provide for officer exculpation.

38. The 2025 Proxy Statement contained the following information regarding "Risk Oversight":

> One of the Board's key functions is informed oversight of our risk management process. The Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various Board standing committees that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company.
>
> Our Audit Committee has the responsibility to consider and discuss with the Company's management and auditors, as appropriate, the Company's guidelines and policies with respect to the management and assessment of risk in all areas of the Company's business, including the Company's major financial, accounting, operational, tax, legal, compliance and privacy risk exposures and the steps taken by management to monitor and control these exposures, such as the Company's enterprise risk management programs. In addition, the Audit Committee considers material risks relating to data privacy, technology and information security,

> including cybersecurity, threats and back-up of information systems and the steps the Company has taken to monitor and control such exposures, as well as overseeing the performance of our internal audit function.

39. With respect to "Accountable Oversight," the 2025 Proxy Statement also stated:

> We have established our corporate governance framework with three guiding principles: (i) effectively addressing the interests of our varied stakeholders; (ii) appropriately managing enterprise risks; and (iii) fostering a culture of integrity and ethics throughout our organization.

40. These statements were materially false and misleading, however, because contrary to representations regarding the Board's and Audit Committee's oversight over enterprise risks and enterprise risk management, among other things, the Board in fact failed to adequately oversee the enterprise risks facing the Company, particularly with respect to the implementation of the ERP system, as alleged herein. Moreover, these statements were false and misleading because it failed to disclose that the ERP system was fundamental to its operational improvements and required significant management attention, while also delaying the implementation timeline to ensure a "flawless" transition. At the same time, the Company did not disclose that the implementation could result in shipment or production delays, instead presenting such risks as hypothetical. As later events suggest, such delays had the potential to impact the Company's ability to maintain retail shelf space and operational performance.

41. Based upon the materially false and misleading 2025 Proxy Statement, the Company's shareholders voted in favor of the proposals therein, including to re-elect Defendants Flanagan, Post, and Ruiz to the Board and broaden the Company's exculpation provision to cover officers. As a result of issuing the false and misleading 2025 Proxy Statement, Defendants Flanagan, Post, and Ruiz benefitted from their continued service, director fees, and ability to continue breaching their fiduciary duties, and the Officer Defendants benefitted from the broadened exculpation provision and approval of compensation.

42. Had Company shareholders known the truth regarding the Board's lack of oversight and management, then it would have impacted how they voted on the proposals in the 2025 Proxy Statement. Accordingly, had shareholders known the Director Defendants were not exercising their mission-critical duties, then it is unlikely that they would have approved their re-election to the Board, nor would shareholders have approved executive compensation or to expand the Company's exculpation provision.

43. On May 8, 2025, Vital Farms filed its Quarterly Report on Form 10-Q for the quarter ended March 30, 2025 (the "1Q 2025 10-Q"). The filing included certifications pursuant to the Sarbanes-Oxley Act of 2002, executed by Defendants Diez-Canseco and Wrede, attesting to, among other things, the accuracy of the Company's financial reporting, the disclosure of any material changes to internal control over financial reporting, and the absence of undisclosed fraud.

44. The 1Q 2025 10-Q stated the following, in relevant part, concerning Vital Farms' internal controls:

> As further detailed in Part II, Item 9A, "Controls and Procedures" of our latest Annual Report, in the process of assessing our internal control over financial reporting, management identified deficiencies in controls to ensure the accuracy of the inputs (e.g., price and/or quantity) related to the sales order entry and invoicing processes impacting revenue and accounts receivable that resulted in a material weakness. Management concluded that this material weakness was primarily due to ineffective risk assessment related to the selection and development of appropriate control activities in the revenue process due to not having a sufficient number of trained resources with expertise in and responsibility for the design, implementation, operation, and documentation of internal control over financial reporting. As a result of the material weakness identified, our management concluded that our internal control over financial reporting was not effective as of December 29, 2024. As described in Part I, Item 4, "Controls and Procedures" in this Quarterly Report, we are implementing additional controls to remediate this material weakness. However, we cannot provide assurance that we will be able to do so in a timely manner, and such remediation efforts could require increased management time and attention and resources.

45. The 1Q 2025 10-Q also repeated the same risk disclosures previously included in the 2024 10-K concerning the Company's implementation of its ERP system, including the following:

> We are in the process of transitioning to a new enterprise resource planning, or ERP, system, in order to support our future growth and more fully optimize our existing processes. The implementation of a new ERP system may prove to be more difficult, costly or time-consuming than expected, and it is possible that the system will not yield the benefits we anticipate. Any disruptions, delays or deficiencies related to the new ERP system could materially impact our operations and adversely affect our ability to process orders, manage our inventory, fulfill obligations to customers or otherwise operate our business. In addition, implementation of a new ERP system will require significant resources, including the time and attention of our management and key crew members, in order to fully realize the anticipated benefits.

46. Also on May 8, 2025, Vital Farms held an earnings conference call for the first quarter of fiscal year 2025. During that call, Wrede made statements concerning the Company's implementation of its ERP system, including the following:

> Now to discuss our digital transformation initiative, which includes our new ERP system implementation. We've updated the launch date from summer to early fall 2025 to ensure flawless switchover. The timing adjustment supports our commitment to minimize any risk for operational disruptions and does not add cost to the budget for the project. We remain fully committed to this investment, which is fundamental to the operational improvements we are planning, including streamlined processes, increased efficiency and an enhanced ability to compete and reinforce our position as an industry leader.

47. These statements are notable in light of the Company's contemporaneous disclosures and the known importance of the ERP implementation to its operations. The Company emphasized that the ERP system was fundamental to its operational improvements and required significant management attention, while also delaying the implementation timeline to ensure a "flawless" transition. At the same time, the Company did not disclose that the implementation could result in shipment or production delays, instead presenting such risks as hypothetical. As

later events suggest, such delays had the potential to impact the Company's ability to maintain retail shelf space and operational performance.

48. On August 7, 2025, Vital Farms filed its Quarterly Report on Form 10-Q for the quarter ended June 29, 2025 (the "2Q 2025 10-Q"). The filing included certifications pursuant to the Sarbanes-Oxley Act of 2002, executed by Defendants Diez-Canseco and Wrede, attesting to, among other things, the accuracy of the Company's financial reporting, the disclosure of any material changes to internal control over financial reporting, and the disclosure of any fraud. The 2Q 2025 10-Q stated the following, in relevant part, concerning the Company's internal controls:

> As further detailed in Part II, Item 9A, "Controls and Procedures" of our latest Annual Report, in the process of assessing our internal control over financial reporting, management identified deficiencies in controls to ensure the accuracy of the inputs (e.g., price and/or quantity) related to the sales order entry and invoicing processes impacting revenue and accounts receivable that resulted in a material weakness. Management concluded that this material weakness was primarily due to ineffective risk assessment related to the selection and development of appropriate control activities in the revenue process due to not having a sufficient number of trained resources with expertise in and responsibility for the design, implementation, operation, and documentation of internal control over financial reporting. As a result of the material weakness identified, our management concluded that our internal control over financial reporting was not effective as of December 29, 2024. As described in Part I, Item 4, "Controls and Procedures" in this Quarterly Report, we are implementing additional controls to remediate this material weakness. However, we cannot provide assurance that we will be able to do so in a timely manner, and such remediation efforts could require increased management time and attention and resources.

49. The 2Q 2025 10-Q contained the following substantially similar risk disclosure regarding Vital Farms' ERP implementation:

> We are in the process of transitioning to a new enterprise resource planning, or ERP, system, in order to support our future growth and more fully optimize our existing processes. The implementation of a new ERP system may prove to be more difficult, costly or time-consuming than expected, and it is possible that the system will not yield the benefits we anticipate. Any disruptions, delays or deficiencies related to the new ERP system could materially impact our operations and adversely affect our ability to process orders, manage our inventory, fulfill obligations to customers or otherwise operate our business. In addition,

> implementation of a new ERP system has required and will continue to require significant resources, including the time and attention of our management and key crew members, in order to fully realize the anticipated benefits.

50. Also on August 7, 2025, Vital Farms held an earnings conference call for the second quarter of fiscal year 2025. During the call, Wrede addressed the Company's ERP implementation, stating in relevant part as follows:

> Our digital transformation [ERP] initiative remains on track and we continue to target early fall 2025 for the switchover. [. . .] Now looking ahead, given our strong performance in the second quarter, including successful implementation of our price increase, we are raising our full year 2025 guidance. We now expect net revenue of at least $770,000,000 representing growth of at least 27% versus 2024, an increase from our previous guidance of at least $740,000,000.

51. These statements should be considered in light of the Company's prior disclosures regarding the importance and operational sensitivity of the ERP implementation. The Company had emphasized that the system was critical to its operations and required significant management attention, and that the rollout was imminent. However, the Company did not disclose that the implementation could result in shipment or production delays, instead continuing to present such risks as hypothetical while increasing its financial guidance. As later developments indicate, such delays had the potential to impact the Company's operations, including its ability to maintain retail shelf space.

52. On November 4, 2025, Vital Farms filed its Quarterly Report on Form 10-Q for the quarter ended September 28, 2025 (the "3Q 2025 10-Q"). The filing included certifications pursuant to the Sarbanes-Oxley Act of 2002, executed by Defendants Diez-Canseco and Wrede, attesting to, among other things, the accuracy of the Company's financial reporting, the disclosure of any material changes to internal control over financial reporting, and the disclosure of any fraud. The 3Q 2025 10-Q stated the following concerning the Company's internal controls in pertinent part:

> As further detailed in Part II, Item 9A, "Controls and Procedures" of our latest Annual Report, in the process of assessing our internal control over financial reporting, management identified deficiencies in controls to ensure the accuracy of the inputs (e.g., price and/or quantity) related to the sales order entry and invoicing processes impacting revenue and accounts receivable that resulted in a material weakness. Management concluded that this material weakness was primarily due to ineffective risk assessment related to the selection and development of appropriate control activities in the revenue process due to not having a sufficient number of trained resources with expertise in and responsibility for the design, implementation, operation, and documentation of internal control over financial reporting. As a result of the material weakness identified, our management concluded that our internal control over financial reporting was not effective as of December 29, 2024. As described in Part I, Item 4, "Controls and Procedures" in this Quarterly Report, we are implementing additional controls to remediate this material weakness (including within our recently implemented enterprise resource planning system). However, we cannot provide assurance that we will be able to do so in a timely manner, and such remediation efforts could require increased management time, attention and resources.

53. The 3Q 2025 10-Q contained the following risk disclosure regarding Vital Farm's implementation of its ERP:

> We recently completed a multi-year transition to a new ERP system to support our future growth and more fully optimize our existing processes. The ERP system implementation required, and is likely to continue to require, investment of significant financial resources and the time and attention of our management and key crew members. It is possible that the system will not yield the benefits we anticipate. Any disruptions, delays or deficiencies related to the new ERP system or the implementation thereof, or the design, integration or implementation of other technology systems we may choose to implement in the future, could materially impact our operations and adversely affect our ability to process orders, manage our inventory, fulfill obligations to customers or otherwise operate our business.

54. Also on November 4, 2025, Vital Farms held an earnings conference call for the third quarter of fiscal year 2025. During that call, Wrede made statements concerning the Company's ERP implementation, including the following:

> We continue to make good progress addressing the material weakness in our revenue recognition process identified in our 2024 annual report. Importantly, this was a design deficiency only with no impact on our financial statements, and we remain on track to complete remediation by year end subject to the ongoing enhancements of controls in the recently implemented ERP system. On to guidance.

> Given our strong performance in the third quarter, we are raising our full year 2025 net revenue guidance to at least $775,000,000 representing growth of at least 28% versus 2024. I would like to point out that we did see a small amount of revenue pull forward into the third quarter from the fourth quarter ahead of our planned ERP go live date. We had announced the go live date to the trade so that they could plan ahead for it.
>
> * * *
>
> Let me also touch a bit more on the ERP implementation. We turned on our new ERP system at the beginning of the fourth quarter on September 29. As planned, the new system is working very well. We put a great internal team in place at a realistic timeline with multiple test iterations and partnered with the right implementation vendor. As is common with any system implementation of this complexity, we are now in a planned hypercare period in the fourth quarter.
>
> During this hypercare period, we budgeted additional resources to support operations at ECS and address any issues as they arise. That said, given that ECS had to learn to operate using new processes and software tools, the ERP startup slowed down production for the first two weeks of the fourth quarter, but that was always part of our plan and therefore has had no impact on our guidance for the full year. However, you can see the impact in the most recent Canada data. Following this expected temporary slowdown, the business has quickly bounced back and we are now operating at pre go live shipment levels.

55. These statements should be considered in light of the Company's prior disclosures regarding the importance and operational sensitivity of the ERP implementation. By this time, the ERP system had already been implemented, and the Company had experienced a slowdown in production associated with that rollout. Despite this, the Company continued to present risks associated with the implementation as hypothetical and characterized the resulting slowdown as planned and without impact to operations or guidance. The Company further indicated that operations had returned to pre-implementation levels and increased its financial guidance. As later developments suggest, such statements did not fully reflect the operational impact of the implementation, including the potential effect on shipment levels and retail shelf space.

**<u>THE TRUTH EMERGES</u>**

56. On February 26, 2026, before markets opened, Vital Farms filed its Annual Report on Form 10-K for the fiscal year ended December 28, 2025 (the "2025 10-K"). In that filing, the Company reported fiscal year 2025 revenue of approximately $759.4 million, below its previously issued guidance of $775 million. The Company also reported earnings per share of $0.35, below market expectations of $0.39.

57. The 2025 10-K further disclosed that the Company experienced disruptions associated with the implementation of its ERP system. Specifically, the Company acknowledged that, in the fourth quarter of fiscal 2025, it experienced disruptions in order and fulfillment levels following the launch of the system.

58. In addition, the Company indicated that the ERP implementation was part of its efforts to strengthen its internal control environment, noting that it had completed a multi-year transition to the system during fiscal year 2025. This disclosure further reflects the significance of the ERP implementation to the Company's operations and internal processes.

59. Also on February 26, 2026, Vital Farms held an earnings conference call for the fourth quarter and full fiscal year 2025. During that call, Wrede made statements concerning the Company's ERP implementation and its operational impact, including the following:

> Even though we have already gained healthy volume share year to date, as Russell had mentioned earlier, volume growth so far is lagging our initial expectations. After the previously discussed several weeks of slow shipments following our ERP implementation last year during the lead-up to the peak holiday period, we are still recapturing shelf space.

60. During the question-and-answer session of the call, the following exchange took place:

> **Scott Marks, Jefferies analyst:**
>
> Appreciate the color on that. next one for me, just relating to the ERP. You know, I think as we think back to, you know, maybe ahead

> of ERP implementation, you had spoken about shifting some inventory in, you know, ahead of the cutover. And then I think Thilo made a comment in the prepared remarks today about regaining some shelf space that may have been lost during that period. So wondering if you can just kinda help us spur away, you know, what was the actual impact from ERP? You know, whether it was, you know, shelf space or changes in order patterns or anything that can just help us get clarity around what the actual impact was and how we should think about, you know, magnitude of recovery from that?
>
> **You:**
>
> You know, we've talked quite a bit about that short-term dislocation. As we've come back into a very, I think, advantageous supply situation with rebuilt inventories, the conversations with retailers have been, frankly, terrific. We've shifted from, "Hey, can you ship what you're talking about?" to, "How can we grow together?" I'm looking forward to reset cycles this year based on those early conversations, we're really talking about making those long-term plans to grow together. We are clearly a category leader. We're seen as playing that role for our retail partners, I think we're well on our way to kind of recovering and putting that process past us.

61. Following these disclosures, the Company's stock price declined by $2.68 per share, or approximately 10.8%, to close at $22.11 on February 26, 2026.

## INSIDER TRADING ALLEGATIONS

62. While the Company's share price was artificially inflated as a result of the wrongful conduct described herein, Defendants Diez-Canseco, O'Hayer, Wrede, Khoury, and Post breached their fiduciary duties to the Company and sold more than 750,000 shares of their personally held Vital Farms holdings while in possession of material, non-public information for personal proceeds of more than $33 million which is subject to complete disgorgement under Delaware law.

63. During the wrongful course of conduct, Defendant Diez-Canseco made the following sales:

| Date | Number of Shares Sold | Average Price of Shares ($) | Total Proceeds ($) |
|---|---|---|---|
| 05/12/2025 | 45,143 | 34.12 | 1,540,384 |

| Date | Number of Shares Sold | Average Price of Shares ($) | Total Proceeds ($) |
|---|---|---|---|
| 08/12/2025 | 16,700 | 46.11 | 770,037 |
| 09/10/2025 | 16,700 | 47.32 | 790,262 |
| 10/08/2025 | 9,667 | 44.39 | 429,098 |
| 12/15/2025 | 16,734 | 35.05 | 586,527 |
| **TOTAL** | **104,944** | **--** | **4,116,308** |

64. Tellingly, Defendant Diez-Canseco has not sold any of his personally-held Vital Farms stock since December 2025, just before the truth emerged. The fact that Defendant Diez-Canseco has ceased all trading for approximately seven months when he previously sold his common stock on a monthly basis during the wrongful course of conduct demonstrates his knowledge and use of material, non-public information.

65. During the wrongful course of conduct, Defendant O'Hayer made the following sales:

| Date | Number of Shares Sold | Average Price of Shares ($) | Total Proceeds ($) |
|---|---|---|---|
| 05/19/2025 | 24,000 | 35.94 | 862,560 |
| 06/13/2025 | 30,000 | 39.17 | 951,822 |
| 07/01/2025 | 30,000 | 39.17 | 1,175,034 |
| 07/23/2025 | 5,000 | 40.34 | 201,700 |
| 08/01/2025 | 30,000 | 35.83 | 1,074,838 |
| 08/07/2025 | 10,000 | 42.78 | 427,800 |
| 08/19/2025 | 800 | 50.31 | 40,248 |
| 08/21/2025 | 4,200 | 50.25 | 211,050 |
| 08/29/2025 | 245,000 | 51.64 | 12,650,664 |
| 09/04/2025 | 100,000 | 50.96 | 5,096,000 |
| 10/01/2025 | 35,000 | 40.15 | 1,405,276 |
| 11/03/2025 | 30,000 | 32.90 | 986,946 |
| 12/01/2025 | 25,000 | 33.17 | 829,194 |
| 12/15/2025 | 5,000 | 35.25 | 176,250 |
| 01/02/2026 | 25,000 | 30.85 | 771,263 |
| 02/02/2026 | 20,000 | 27.91 | 558,136 |
| **TOTAL** | **619,000** | **--** | **27,418,781** |

66. Conveniently, Defendant O'Hayer's trade volume significantly increased when the Company's share price was at its highest. However, prior to and after that peak, Defendant

O'Hayer did not make any trades of that volume again. Moreover, Defendant O'Hayer only made two more sales after the truth emerged and has not sold any stock since March 2026, which marks a change in his selling pattern during the wrongful course of conduct.

67. During the wrongful course of conduct, Defendant Wrede made the following sales:

| Date | Number of Shares Sold | Average Price of Shares ($) | Total Proceeds ($) |
|---|---|---|---|
| 06/12/2025 | 1,200 | 31.93 | 38,316 |
| 07/11/2025 | 1,200 | 38.97 | 46,764 |
| 08/11/2025 | 1,200 | 45.56 | 54,672 |
| 08/14/2025 | 3,393 | 47.59 | 161,462 |
| **TOTAL** | **6,993** | **--** | **301,214** |

68. The above-referenced sales are Defendant Wrede's only sales of the Company's stock. Prior to the wrongful course of conduct, Defendant Wrede did not sell any Vital Farms stock, nor has he sold any since the truth emerged. The fact that his sales were made only when the Company's share price was artificially inflated is highly suspicious and demonstrates his use of material, non-public information.

69. During the wrongful course of conduct, Defendant Khoury made the following sales:

| Date | Number of Shares Sold | Average Price of Shares ($) | Total Proceeds ($) |
|---|---|---|---|
| 08/13/2025 | 20,000 | 47.63 | 952,600 |
| **TOTAL** | **20,000** | **--** | **952,600** |

70. While Defendant Khoury sold some of his Vital Farms common stock prior to the wrongful course of conduct, the above-referenced sale is his largest ever and was timed to take advantage of the Company's artificially inflated stock price which, at the time of his sale, was trading at more than double the share price once the truth was revealed.

71. During the wrongful course of conduct, Defendant Post made the following sales:

| Date | Number of Shares Sold | Average Price of Shares ($) | Total Proceeds ($) |
|---|---|---|---|
| 08/14/2025 | 6,086 | 47.75 | 290,607 |
| **TOTAL** | **6,086** | **--** | **290,607** |

72. As with Defendant Khoury, while Defendant Post sold some of his Vital Farms common stock prior to the wrongful course of conduct, the above-referenced sale is his largest ever and was timed to take advantage of the Company's artificially inflated stock price which, at the time of his sale, was trading at more than double the share price once the truth was revealed.

## DAMAGE TO THE COMPANY

### Securities Class Action

73. On March 27, 2026, a securities class action complaint was filed in the United States District Court for the Western District of Texas asserting claims against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, in the case captioned: *Wilkerson v. Vital Farms, Inc., et al.*, Case No. 1:26-cv-00738 (W.D. Tex.) ("Securities Class Action").

74. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers, as well as any settlement or liability that results.

### Insider Trading

75. As described above, Defendants Diez-Canseco, O'Hayer, Wrede, Khoury, and Post each used their material, non-public information about the Company to take advantage of the Company's artificially inflated stock price. As a result, Defendants Diez-Canseco, O'Hayer, Wrede, Khoury, and Post reaped more than $33 million in unlawful insider proceeds which is subject to complete disgorgement.

**Unjust Compensation**

76. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

77. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

78. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

79. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

80. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

81. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

82. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

83. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

### Code of Conduct

84. At all relevant times, the Company had its Code of Business Conduct and Ethics ("Code of Conduct") which "reflect[s] the business practices and principles that [Vital Farms] believe will most effectively support our mission" and "applies to crew members at all levels of Vital Farms (including our officers), as well as members of our Board of Directors."

85. The Code of Conduct outlines the "Crew Member Responsibilities" as follows:

> We expect each of our crew members and directors to:
>
> • Conduct all business in an honest and ethical manner, in compliance with the law
>
> • Read and understand the guidelines and principles described in this Code and apply good judgment and the highest personal ethical standards in making business decisions

• When considering potential ethical issues, consider not only your own conduct, but also that of immediate family members and other people within your household

• Ask questions about difficult decisions and report potential misconduct to your manager, the People team, the Legal Department, and/or our Whistleblower Hotline.

86. In a section regarding "Legal Compliance," the Code of Conduct states the following:

> Obeying the law is the foundation of this Code.
>
> Our success depends upon each crew member operating within legal guidelines and cooperating with local, national, and international authorities. We expect crew members to understand the legal and regulatory requirements applicable to their departments and areas of responsibility and to escalate requests from regulatory authorities to the Legal team where appropriate.
>
> While we do not expect you to memorize every detail of these laws, rules, and regulations, we want you to be able to determine when to seek advice from others. If you have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your manager or a member of the Legal Department.
>
> Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties.

87. Regarding "Company Assets," the Code of Conduct states:

> All crew members and directors are expected to protect our assets and ensure their efficient use. Theft, carelessness, and waste will adversely impact our ability to serve our stakeholders.

88. In a section regarding "Financial Integrity," the Code of Conduct states:

> As a public company, the integrity of our records and public disclosure depends upon the validity, accuracy, and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records must be completed accurately and honestly.
>
> The making of false or misleading entries in our business records is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to investors, customers, suppliers, creditors, regulators, crew members, and others. We also rely upon our accounting and other business and corporate records in preparing publicly filed reports. Securities laws require that these reports provide full, fair, accurate, timely, and understandable

> disclosure and fairly present our financial condition and results of operations. Crew members who contribute in any way in preparing or verifying these reports (or the information used for these reports) should strive to ensure that our disclosures are complete, accurate, and transparent.

89. The Individual Defendants failed to adhere to the Code of Conduct when they issued false and misleading statements and engaged in the wrongdoing described herein. Additionally, the Individual Defendant's failure to maintain the accuracy of Company records and reports, along with their failure to report other mismanagement, violates the Code of Conduct's sections regarding ethical obligations, confidentiality, and company assets.

**<u>Audit Committee Charter</u>**

90. At all relevant times, the Company had in place its Audit Committee Charter which sets forth the duties and responsibilities of the Audit Committee, which is comprised of Defendants Flanagan, Cyr, and Kennedy. As stated in the Audit Committee Charter, the purpose of the Audit Committee is to:

> • oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;
>
> • manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");
>
> • maintain and foster an open avenue of communication with the Company's management, internal audit group and Auditors;
>
> • review any reports or disclosures required by applicable law and stock exchange listing requirements;
>
> • oversee the design, implementation, organization, and performance of the Company's internal audit function;
>
> • help the Board oversee the Company's legal and regulatory compliance;

• review and assess the Company's risk management, risk assessment and major risk exposures with respect to financial, accounting, operational, tax, privacy, cybersecurity and information technology risks; and

• provide regular reports and information to the Board.

91. The Audit Committee Charter also sets forth the following duties and responsibilities of the Audit Committee:

> The Committee's responsibilities are for oversight. The members of the Committee are not employees of the Company, and they do not perform management's or any Auditors' functions. The Committee relies on the expertise and knowledge of management, the internal auditors (if any), and any Auditors in carrying out its oversight responsibilities. Management is responsible for preparing accurate and complete financial statements in accordance with GAAP, crafting periodic reports, and establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting. The Auditors will audit the Company's annual consolidated financial statements and, when required, the effectiveness of the Company's internal control over financial reporting and review the Company's quarterly financial statements. It is not the Committee's responsibility to prepare or certify the Company's financial statements, guarantee the audits or reports of the Auditors, certify as to whether any Auditors are "independent" under applicable law or stock exchange listing requirements, or ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP, or otherwise comply with applicable law or stock exchange listing requirements or the Company's policies.
>
> The Committee shall have the following responsibilities; provided, however, that this list of responsibilities is intended to be a guide and to remain flexible to account for changing circumstances and needs. Accordingly, the Committee may depart from or supplement such responsibilities, and establish policies and procedures, to the extent permitted by applicable law and stock exchange listing requirements.
>
> * * *
>
> ***Financial Review and Disclosure***
>
> **6. Annual Audit Results.** The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:
>
> • the Auditors' assessment of the quality of the Company's accounting principles and practices;
>
> • the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and

estimates (including material changes in estimates and analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements);

• all misstatements identified during the audit (other than those the Auditors believe to be trivial);

• the adequacy of the disclosures in the financial statements; and

• any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

**7. Audited Financial Statement Review.** The Committee will review and discuss with management and the Auditors, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC, including the disclosures under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations." Following this review, the Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

**8. Quarterly Results Review.** The Committee will review and discuss with management and the Auditors, as appropriate, the quarterly financial statements, including the disclosures under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the results of the Auditors' review of such financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under applicable PCAOB standards.

**9. Earnings Announcements.** The Committee, either as a Committee or together with the full Board, will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information).

**10. Proxy Report.** The Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

**11. Accounting Principles and Policies.** The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

• critical accounting policies and practices;

• alternative accounting policies available under GAAP;

• the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and

• any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies. The Committee will review with the Auditors and management, if appropriate, any written communication, such as any management letter or internal control letter, and monitor management's response to such communications.

**12. Auditor Communications.** At least annually, the Committee will discuss with the Auditors the matters required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB).

**13. Management Cooperation with Audit.** The Committee will evaluate management's cooperation with the Auditors during their audit examination, including any significant difficulties or disagreements encountered during the audit, if any.

**14. Disagreements Between Auditors and Management.** The Committee will review with management and the Auditors any disagreements between management and the Auditors, whether or not resolved, regarding financial reporting, accounting practices or policies or other matters, that individually or in the aggregate could be significant to the Company's financial statements or the Auditors' report, and management's response, if any, and will resolve any conflicts or disagreements regarding financial reporting.

**15. National Office Communications.** The Committee will review with the Auditors, as appropriate, communications between the audit team and the Auditors' national office with respect to accounting or auditing issues presented by the engagement.

* * *

***Legal, Regulatory and Ethical Oversight***

**17. Risk Assessment and Management.** The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management, and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key

business risks faced by the Company, including but not limited to privacy and information security, competition, and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding privacy and information security, the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks, and the Company's disclosure of its material risks (including through the "Risk Factors" sections in the Company's annual and quarterly reports filed with the SEC). The Committee will review and discuss with management the adequacy of the Company's insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

**18. Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with management and the Auditors concerning the scope, design, adequacy, and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

**19. Correspondence with Regulators.** The Committee will consider and review with management, the Auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

**20. Internal Control Report.** At least annually (if required by applicable stock exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

* * *

**22. Ethical Compliance.** The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and stock exchange listing requirements, including the Company's Code of Business Conduct and Ethics ("Code"). The Committee will consider any request by directors or executive officers of the Company for a waiver from the Code. Any approved waivers shall be promptly disclosed as required by applicable law and stock exchange listing requirements.

* * *

> **29. Other Legal and Finance Matters.** The Committee will review with management legal and regulatory compliance and any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements or as otherwise deemed appropriate by the Committee.

92. The Audit Committee failed to uphold their duties required by the Audit Committee Charter by failing to conduct oversight of the Company's engagement in the Individual Defendant's issuing false and misleading statements to the public. Furthermore, the Audit Committee violated the Audit Committee Charter by failing to maintain the accuracy of Company reports and records, failing to comply with laws and regulations, and failing to properly report violations to the rest of the Audit Committee.

**DUTIES OF THE DIRECTOR DEFENDANTS**

93. As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

94. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

95. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are

required to act in furtherance of the best interests of the Company and its investors.

96. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

97. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

98. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

99. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## **DERIVATIVE AND DEMAND REFUSED ALLEGATIONS**

100. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Individual Defendants' violations of the law, and their breaches of fiduciary duties, waste of corporate assets, and other wrongful conduct as alleged herein.

101. Plaintiff is a current stockholder of Vital Farms and has owned Vital Farms stock at all relevant times hereto. Plaintiff understands his obligation to hold Vital Farms stock throughout the pendency of this action and is prepared to do so.

102. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

103. Following the alleged misconduct and damage, on April 22, 2026, Plaintiff made a demand (the "Demand") on the Board of Directors (the "Board") to commence a civil action against each responsible entity and affiliate of the Company – naming each of the Individual Defendants – to recover, for the benefit of the Company, the damage caused to it. Attached hereto as Exhibit A is a true and correct copy of the Demand.

104. The Demand was returned to Plaintiff due to the Company's purported change of address. Accordingly, Plaintiff sent the Demand to the Company's updated address on May 21, 2026. Attached hereto as Exhibit B is a true and correct copy of that correspondence.

105. To date, however, the Board has failed to provide any response or acknowledgement regarding the Demand. This inaction is at odds with a Board's duty to promptly consider a litigation demand and thus constitutes a willful and wrongful refusal of the Demand.

106. The Board has been on notice of the wrongdoing alleged herein since at least the commencement of the Securities Class Action, filed in March 2026, if not from the beginning of

the wrongdoing alleged herein. As a result of the wrongdoing alleged herein, the Company has suffered significant harms and continues to suffer significant harms from its defective internal controls and exposure to legal and business risk, which the Board have been further made aware of as a result of the denial of the motion to dismiss in the Securities Class Action. However, to date, the Board has failed to take any action on behalf of the Company.

107. Because the Individual Defendants plausibly knew about the wrongdoing, the Board ignoring Plaintiff's Demand and failing to take any action to remedy the harms alleged herein constitutes a wrongful refusal of the Demand which will irreparably prejudice the Company and its claims because, among other things, the wrongs complained of in the Demand remain uncorrected and the Company will suffer additional damage as it moves forward with defective internal controls and burdened with the financial harms caused to it.

108. In addition, the Board's refusal could subject the Company's claims to the applicable statute of limitations period, leaving the Company without remedy. As such, the Board's refusal cannot be reasonably interpreted as being in the best interests of the Company or the product of prudent business judgment.

109. Furthermore, the Board has ignored the Demand for several months as of the date of this complaint. This lengthy delay in taking any action carries the risk that as time progresses, evidence becomes stale, memories dim, and the ability to adequately investigate and/or prove the allegations herein will become more burdensome, particularly given the risks of potential destruction of documents and electronic data (whether intentional or inadvertent), dissipation of the Company's assets, fading memories, and increased geographical dispersion of percipient witnesses. Thus, the Board's lengthy and continued inaction here does not serve the interests of the Company in being able to adequately investigate and/or bring the claims that belong to it.

110. Accordingly, the Board's response here is an unreasonable and wrongful refusal of Plaintiff's Demand to initiate an action for the benefit of the Company. The Company has suffered damage and will continue to suffer damage if the wrongs complained of herein remain uncorrected. Thus, Plaintiff has satisfied the demand requirements and may pursue this action to procure a judgment in the Company's favor and should be permitted to proceed with this derivative action.

## FIRST CAUSE OF ACTION

## (Against the Individual Defendants for Breach of Fiduciary Duties)

111. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

112. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

113. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

114. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by engaging in the misconduct described herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

115. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

116. As a direct and proximate result of the Individual Defendants' breach of their

fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

117. Defendants Diez-Canseco, O'Hayer, Wrede, Khoury, and Post further breached their fiduciary duties to the Company when they used their material, non-public information to take advantage of the Company's artificially inflated share price in order to reap more than $33 million in unlawful insider sales.

**SECOND CAUSE OF ACTION**

**(Against the Individual Defendants for Gross Mismanagement)**

118. Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

119. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

120. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

121. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

122. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

124. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

125. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

126. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

128. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

129. Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FIFTH CAUSE OF ACTION

## (Against the Director Defendants for Violations of Section 14(a) of the Exchange Act)

130. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

131. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

132. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

133. The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

134. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy Statement, which was filed with the SEC. As alleged above, the 2025 Proxy Statement was materially false and misleading because contrary to representations regarding the Board's and Audit Committee's oversight over enterprise risks and enterprise risk management, among other things, the Board in fact failed to adequately oversee the enterprise risks facing the Company, particularly with respect to the implementation of the ERP system, as alleged herein. Moreover, these statements were false and misleading because it failed to disclose that the ERP system was fundamental to its operational improvements and required significant management attention, while also delaying the implementation timeline to ensure a "flawless" transition. At the same time, the Company did not disclose that the implementation could result in shipment or production delays, instead presenting such risks as hypothetical. As later events suggest, such delays had the potential to impact the Company's ability to maintain retail shelf space and operational performance.

135. The misrepresentations and omissions in the 2025 Proxy Statement were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the re-election of certain Director Defendants, approving executive compensation, and expanding the Company's exculpation provision.

136. The materially false and misleading statements contained in the 2025 Proxy Statement improperly induced shareholders to vote for the reelection of Defendants Flanagan, Post, and Ruiz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company while continuing to reap director fees, and induced shareholders to approve the broadened exculpation provision to benefit the Officer Defendants.

137. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2025 Proxy Statement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A. Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, unjust enrichment, and waste of corporate assets;

C. Awarding, against the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

D. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Awarding such other and further relief as is just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 8, 2026

**THE BROWN LAW FIRM, P.C.**

*/s/ Saadia Hashmi*
Saadia Hashmi (State Bar No.: 24139546)
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

**VERIFICATION**

I, CHIRAG MODY, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Vital Farms, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Vital Farms, Inc. common stock at all relevant times.

Chirag Mody (Jul 1, 2026 12:20:31 EDT)

CHIRAG MODY